7 F.3d 226
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
BLUE RIDGE PLATING COMPANY, INCORPORATED, a corporation;
Bill Joe Benfield, Defendants-Appellants.
 No. 92-5441.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 4, 1993.
Decided: September 14, 1993.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Richard L. Voorhees, Chief District Judge. (CR-90-143-A)
 Argued: Jack W. Stewart, Jr., Asheville, North Carolina, for Appellants.
 Thomas Michael Gannon, United States Department of Justice, Washington, D.C., for Appellee.
 On Brief: Thomas J. Ashcraft, United States Attorney, Jerry W. Miller, Assistant United States Attorney, Asheville, North Carolina, for Appellee.
 W.D.N.C.
 AFFIRMED.
 Before WIDENER and LUTTIG, Circuit Judges, and MACKENZIE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Bill Joe Benfield is the owner, President, and Chief Operating Officer of Blue Ridge Plating Company (Blue Ridge), an electroplating facility located in Buncombe County, North Carolina. Benfield and Blue Ridge were convicted of two counts of intentionally discharging pollutants, two counts of intentionally discharging pollutants without a permit, and one count of making false statements.[1] The defendants twice moved for a new trial based on newly discovered evidence, and the district court denied both motions. The defendants appeal, and we affirm.
 
 
 2
 As part of an industrial waste program, the Metropolitan Sewerage District (Metropolitan) of Buncombe County routinely monitored waste discharges from industries in Buncombe County, including Blue Ridge. These samples indicated that from 1979 to 1988 Blue Ridge was discharging measurable amounts of cadmium, chromium, and zinc into the Metropolitan sewer system. Following contacts from Metropolitan and the Environmental Protection Agency (EPA), the Federal Bureau of Investigation (FBI), with the help of the United States Attorney for the Western District of North Carolina, placed Blue Ridge under environmental investigation in the fall of 1989.
 
 
 3
 After locating an upstream checkpoint on the sewer line that ran behind Blue Ridge, the FBI used a green and yellow dye to identify a downstream checkpoint on the sewer line. The upstream checkpoint was used to test the sewer water before it reached Blue Ridge and the downstream checkpoint was used to check the sewer water after it left Blue Ridge. So that they would test emissions only from Blue Ridge, the FBI examined sewer maps to see that no other lines ran into the sewer between the two check points and sealed with roofing tar four manholes on the sewer line between the two check points. The only other access to the sewer line, discovered after the sampling operation was completed, was a four-inch clean-out pipe coming from Hobson Construction Company that Metropolitan used to clean out any stoppages in the sewer line.[2] Finally, Metropolitan's records indicated that no business located upstream from Blue Ridge had a permit to discharge industrial waste water and Metropolitan's monitoring crews verified that Hobson was the only business connected to the sewer system. In late October 1989 the FBI placed three sampling devices on the sewer line. One was placed in a clearly visible location behind Blue Ridge to place it on notice that measurements were being taken. The other two sealed and locked samplers with pH meters were then placed within the enclosed manholes at each checkpoint.
 
 
 4
 On October 26, 1989, after the visible sampler behind Blue Ridge had been in place for about a week, the FBI removed it and turned on the upstream and downstream samplers. The FBI took samples each night from October 26 to November 1 and transferred them to Metropolitan's laboratory in Asheville, North Carolina. At the lab the samples were broken down into smaller bottles for later analysis and then placed in a sealed and locked refrigerator for security. At the request of the FBI, the samples were analyzed by both Metropolitan and an independent laboratory. Testing revealed that samples procured on October 28, 1989, showed the downstream emission of particulate matter and amounts of cadmium, chromium and zinc in excess of those contained in the upstream samples. The sampling procedures were repeated in January 1990 with samples taken on January 25 showing similar results.
 
 
 5
 On January 24, 1990, the FBI obtained a warrant to search Blue Ridge. On January 25, 1990, the FBI executed the search warrant and, along with personnel from Metropolitan, the EPA, and the State of North Carolina, searched the premises for equipment to pretreat waste, the types of waste on site, points of access to the sewer line, and business records on water treatment procedures. As soon as the search began, the plant manager called Benfield to the plant. The search revealed piping in the basement of the plant that emerged from a vat equipped with a sump pump, went out onto the ground at the rear of the facility, ran through a series of tanks, and terminated in a clarifier tank. No return line from the clarifier tank was discovered and Benfield confirmed that no return line from the clarifier tank to the facility existed.[3] A pipe with a valve on it left the clarifier tank and entered another piece of pipe that ended in the vicinity of the sewer port where Metropolitan had placed the visible sampling device in October 1989. In the basement of Blue Ridge three pieces of pipe were located that, when joined together, created a line that perfectly matched the distance between the line leaving the clarifier tank and the sewer port. An analysis of samples taken from the clarifier tank indicated that the clarifier tank contained the same elements as the downstream samples.
 
 
 6
 During the search no agent observed the presence of a closed-loop water treatment system, and Benfield, who handled all of the waste water treatment, stated that the waste water was treated by either boiling it away or reusing it on the premises and that the vat in the basement was part of the treatment system. Benfield did not explain how the outside tank figured into the treatment system and stated that Blue Ridge's operations did not create any sludge. During the search the agents observed no aeration or evaporation system at Blue Ridge and despite the fact that Benfield stated that 300 to 500 gallons of water were boiled away each day, the agents saw no evidence of exhaust fans or large amounts of steam in the plating area.
 
 
 7
 On appeal, defendants first claim that the evidence presented at trial failed to support their convictions.[4] Because no one ever observed either of the defendants engaging in unlawful dumping, the defendants claim that their convictions rest on mere speculation and conjecture. Viewing the evidence presented at trial in the light most favorable to the government, we are of opinion that substantial evidence in the record supports the jury's verdict. See Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 8
 The evidence at trial indicated that the government identified two sewer line checkpoints, one upstream from Blue Ridge and one downstream, that the government sealed the sewer line between the two checkpoints so that only emissions from Blue Ridge would be monitored, that the government took measures to prevent any tampering with the monitoring devices, and that the government obtained samples on two different days indicating that the defendants had dumped pollutants. A search of the premises produced evidence showing that waste water was pumped to an outside tank that had no operational return line to the facility, that this tank had an outlet pipe near a sewer port, and that three pieces of pipe located on the premises formed a perfect line, when pieced together, from the tank to the sewer port. The evidence also indicated that the water in the tank contained the same pollutants as those measured in the downstream samples and that Blue Ridge did not have adequate facilities either to dispose of the waste water or to treat it for use in a closed loop system.
 
 
 9
 Defendants next claim, on several grounds, that the district court erred in allowing the government to admit under Fed. R. Evid. 404(b) Metropolitan's summary of monitoring samples taken from Blue Ridge between September 5, 1979, and June 10, 1988. We are of opinion that the district court did not abuse its discretion in admitting the summary under Rule 404(b). See United States v. Mark, 943 F.2d 444, 447 (4th Cir. 1991). In this case, the government introduced the summary for the proper purposes of showing the defendants' identity as the source of prior pollutants discharges into the Metropolitan sewer system and showing the defendants' knowledge of these discharges. See Fed. R. Evid. 404(b). We are of opinion that this evidence was relevant because it showed that Blue Ridge, as a former discharger of the same pollutants, was the most likely source of the discharge of pollutants detected in the two downstream samples and that Blue Ridge knew of these previous discharges due to the practice of splitting samples. We also are of opinion that the dates involved were not too remote from the events charged in the indictment, see United States v. Rawle, 845 F.2d 1244, 1246-48 (4th Cir. 1988) (admitting evidence of conduct from 1975 to 1979 for crime occurring in 1983), that the summary was necessary, and that it was reliable in light of the testimony regarding Metropolitan's standard sampling procedures. See Mark, 943 F.2d at 447. Finally, we are of opinion that any prejudice which might be deemed unfair attributable to the summary was cured by the district court's limiting instruction. See Huddleston v. United States, 485 U.S. 681, 691-92 (1988).
 
 
 10
 Defendants next claim that the government's failure to split the samples with them and the government's subsequent destruction of the samples deprived them of a fair trial. They claim that the government was obligated to split the samples with them because it is the standard procedure of Metropolitan to split samples taken during its routine monitoring activities and of environmental regulatory agencies to split samples taken during civil enforcement proceedings. Because defendants do not claim a violation of Brady v. Maryland, 373 U.S. 83, 87 (1963), and because the samples were inculpatory rather than exculpatory, we are of opinion that the government's failure to split the samples taken during the investigation did not unduly prejudice the defendants and does not mandate a reversal.[5] Similarly, we are of opinion that the government's failure to preserve the samples does not mandate a reversal because the defendants have put on no evidence of bad faith in the destruction of the samples. See Arizona v. Youngblood, 488 U.S. 51, 58 (1988).
 
 
 11
 The next point is that the government failed to prove a violation of the pretreatment standards set forth in 40 C.F.R.s 403.5 and that the variance between the pretreatment standards in the indictment and the pretreatment standards given to the jury mandates a reversal. Because we are of opinion that substantial evidence exists showing a violation of the pretreatment standards given to the jury, the only issue left is whether the alleged variance warrants a reversal. The superseding indictment charged defendants, in part, in counts 3 and 5, with violating 33 U.S.C. § 1317(d) and the pretreatment standards set forth in 40 C.F.R. § 413.14(b). During trial, the government notified defendants that it would request that the jury be instructed on the Metropolitan pretreatment standards encompassed by § 403.5, the pass through regulation governing discharges of pollutants into publicly owned treatment works, rather than the pretreatment standards set forth in § 413.14(b). Over an objection by defendants, the district court instructed the jury on the Metropolitan standards.
 
 
 12
 We are of opinion that the district court did not err in instructing the jury on the Metropolitan pretreatment standards encompassed by § 403.5. Although those counts of the indictment did not state that the defendants were charged with a violation of the Metropolitan standards under § 403.5, they did charge the defendants with violations of § 1317(d).[6] Section 403.5 was promulgated to implement § 1317, see 40 C.F.R. Part 402, and specifically incorporates local pretreatment requirements.[7] The Metropolitan pretreatment standards are local pretreatment standards within the meaning of § 403.5(d), as defendants concede, and thus the indictment did charge defendants with violating the Metropolitan pretreatment standards. Although the district court submitted the Metropolitan standards to the jury rather than the § 413.14(b) standards, we are of opinion that this variance, even if any existed, was one of form rather than substance and that it did not affect defendants' substantive rights. See Fed. R. Crim. P. 52(a); United States v. Morrow, 925 F.2d 779, 781 (4th Cir. 1991). The indictment charged defendants with violations ofs 1317(d) and thus adequately informed them of the violations of the local pretreatment regulations that are encompassed by § 403.5. See 925 F.2d at 781.
 
 
 13
 Defendants finally argue that the district court erred in not granting either of their post-trial motions for new trial based on newly discovered evidence. After a hearing on the first motion, the district court held that the new evidence was merely impeaching, that defendants had not shown diligence in discovering the evidence, and that defendants had not shown that the evidence was likely to result in an acquittal because it did not establish that other users of similar chemicals had access to the sewer line between the two monitoring points during the relevant time period. Defendants renewed their motion prior to the sentencing hearing offering by way of an Offer of Proof newly discovered evidence that a fifth and additional manhole between the two checkpoints was discovered on the premises of Artech Industries.[8] Because the defendants did not provide any evidence, other than that presented at trial or at the hearing on the first motion, to show that pollutants had entered the sewer line from the manhole during the relevant time period, the district court denied the motion for new trial. Having reviewed the newly discovered evidence offered by defendants, we are of opinion that the district court did not abuse its discretion in denying both of the motions for new trial. See United States v. Arrington, 757 F.2d 1484, 1486 (4th Cir. 1985).
 
 
 14
 Accordingly, the judgments of the district court are
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 Defendants were charged with three counts of knowingly and intentionally discharging pollutants into the Buncombe County publicly owned treatment works in violation of the national pretreatment standards for the electroplating industry, 33 U.S.C.ss 1317(b) & (d) and 1319(c)(2)(B), and 40 C.F.R. § 413.14(b), three counts of knowingly and intentionally discharging pollutants into the Buncombe County publicly owned treatment works without a National Pollutant Discharge Elimination System permit in violation of 33 U.S.C # 8E8E # 1311(a) and 1319(c)(1), and one count of knowingly and willfully making false, fictitious, and fraudulent statements concerning the disposal of pollutants in violation of 18 U.S.C. § 1001. They were acquitted on two of the seven counts, counts one and two
 
 
 [2]
 In March 1992 a fifth manhole between the two checkpoints was discovered on the premises of Artech Industries. This evidence was not presented to the jury, and we consider it infra when addressing defendants' motions for new trial based on newly discovered evidence
 
 
 [3]
 Kenneth Schmidt, the plant manager of Blue Ridge, testified that he originally told the FBI that no return line from the clarifier tank existed. Benfield later showed Schmidt a return line from the clarifier tank, but Schmidt testified that it was not operational and had not been used for the past five or six years
 
 
 [4]
 We note that defendants base one of their sufficiency of the evidence arguments on evidence discovered after trial. We address the post-trial motions late in this opinion
 
 
 [5]
 At oral argument the defendants stated that they did not dispute the sample results, rather they disputed that Blue Ridge was the source of the sample results
 
 
 [6]
 Section 1317(d) states:
 After the effective date of any effluent standard or prohibition or pretreatment standard promulgated under this section, it shall be unlawful for any owner or operator of any source to operate any source in violation of any such effluent standard or prohibition or pretreatment standard.
 
 
 [7]
 Section 403.5 states in pertinent part:
 (a)(1) General prohibitions. A User may not introduce into a POTW [Publicly Owned Treatment Works] any pollutant(s) which cause Pass Through or Interference. These general prohibitions and the specific prohibitions in paragraph (b) of this section apply to each User introducing pollutants into a POTW whether or not the User is subject to other National Pretreatment Standards or any national, State, or local Pretreatment Requirements.
 ...
 (d) Local limits. Where specific prohibitions or limits on pollutants or pollutant parameters are developed by a POTW in accordance with paragraph (c) above, such limits shall be deemed Pretreatment Standards for the purposes of section 307(d) of the Act [33 U.S.C. § 1317(d) ].
 
 
 [8]
 This manhole was discovered in March 1992. It was situated on Artech Industries' property inside a chain link fence and covered with pallets